UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL MINTZ, *et al.*, | Civil No. 05-CV-1470-L(CAB) |
| Plaintiffs, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| DIETZ & WATSON, INC., *et al.*, | |
| Defendants. | |

This matter came on for claim construction hearings in accordance with *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

**FACTUAL BACKGROUND**

Plaintiffs hold United States Patent Number 5,413,148 (the '148 patent) entitled "Casing Structure for Encasing Meat Products" that has a total of eight claims. The patent issued on January 6, 1994. This patent is intended to facilitate the cooking and/or smoking process of meat products by way of an encasement that integrates a knitted stockinette and knitted netting arrangement. The netting arrangement provides a visual appearance, a checkerboard, that is integrally formed with the stockinette member, which is intended to compress the meat and to prevent the meat from pressing through the netting arrangement, to form a one-piece tubular meat encasement. Plaintiffs allege defendants have infringed the '148 patent.

## APPLICABLE PATENT LAW

There is patent infringement if any one of a patent's claims covers the alleged infringer's product or process. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). Before determining whether a patent covers an alleged infringing device, it is necessary to conduct a claim construction hearing to determine what the terms of the claim mean. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)(*en banc), aff'd*, 517 U.S. 370 (1996); *see also, Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1332 (Fed. Cir. 2004); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 874 (Fed. Cir. 2004). "A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). "'The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.'" *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1381 (Fed. Cir. 2005) (quoting *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)).

Under *Markman*, the court as a matter of law must construe the claims of the patent at issue. *Markman*, 52 F.3d at 979; *Terlep*, 418 F.3d at 1381-82. "Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*)). "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. The plain and ordinary meaning defines the scope of the claim unless the patentee has explicitly disclaimed or clearly disavowed this meaning in the specification or prosecution history. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (requiring "words or expressions of manifest exclusion or restriction" before broad terms in a claim will be read

narrowly in light of a narrow specification).

## DISCUSSION

### I.   Claims at Issue

The parties dispute several terms used in Claim 1, the only independent claim, and dependent Claim 4.  The claims read as follows:

> 1. An elongated tubular casing structure for encasing meat products, said elongated structure having a longitudinal direction and a transverse lateral direction, said casing structure comprising:
>
> a stockinette member comprising a closely knit tubular member formed of closely knit threads and having a first stretch capacity;
>
> a knitted netting arrangement having a second stretch capacity and comprising a first plurality of spaced strands extending in said longitudinal direction and a second plurality of spaced strands extending in said lateral direction;
>
> the longitudinal and lateral strands of said netting arrangement each intersecting in locking engagement with one another to form a grid-like pattern comprising a plurality of four-sided shapes;
>
> said strands of said netting arrangement being knit into the threads of said stockinette member, whereby said netting arrangement and said stockinette member are integrally formed so that said casing structure comprises an integrally formed structure;
>
> said first stretch capacity being greater than said second stretch capacity;
>
> WHEREBY when a meat product is stuffed into said casing structure under pressure, said meat product forms a bulge within each of said four-sided shapes to thereby define a checker-board pattern on the surface thereof, said stockinette member forming a shield to prevent the adherence of adjacent meat product bulges over said strands of said netting arrangement.
>
> 4. A casing structure as defined in claim 3 wherein each loop is interlaced with an adjacent preceding loop and an adjacent following loop;
>
> whereby to form a plurality of aligned interlaced loops;
>
> each longitudinal strand comprising one of said aligned interlaced loops.

(Patent)

The parties dispute the construction of the following terms:  "integrally formed", "stockinette member", "netting arrangement", "strand", "thread", "longitudinal strand",

"latitudinal strand", "locking engagement" and "checkerboard pattern".[1]

### 1. Integrally Formed

Plaintiffs provide an ordinary and customary construction of the term "integrally formed": "formed as a unit." As plaintiffs pointed out during the Markman hearing, "that is the plain meaning of this language." (Markman Tr. at 45.)

Defendants assert that plaintiffs' plain meaning of the term is too simplistic and not reflective of the "claim language, specification and drawings, the prosecution history and the plaintiffs' own brief." *Id.* at 62. In contrast to the plain meaning definition, defendants' proposed construction of "integrally formed" is "the strands of the netting arrangement are knit into the physically divisible stockinette member to form a unit." Defendants first point to Figure 1 of the patent which shows a netting arrangement standing alone. With their proposed construction, defendants further contend they are relying on the claim itself which indicates that the strands of the netting arrangement are to be knit into the threads of the stockinette member to create an integrally formed structure. *Id.* at 62-63. But defendants' proposed construction does not take into account the patent's second preferred embodiment which demonstrates that two separate structures are unnecessary.

Here, plaintiffs have not demonstrated an intent to deviate from the ordinary and customary meaning of "integrally formed" by redefining the term. Based on claim language, the Court construes "integrally formed" as "formed as a unit."

### 2. Stockinette Member

Plaintiffs' proposed construction of "stockinette member" is "a closely knit tubular member formed of closely knit threads." Defendants would modify plaintiffs' construction to include: "closely knit threads forming rows of regular loops and having a closer knit and smaller opening than the netting arrangement."

---

[1] In the initial joint claim construction statement, certain terms were included that subsequently have been withdrawn from construction consideration, *viz.* "for encasing meat products", tubular", "closely knit", "stretch capacity", "knitted", "intersecting", "whereby", and "interlaced". (Joint Claim Construction Statement at 3. [doc. #44])

Plaintiffs contend that defendants "agree that the proposed definition offered by the plaintiffs is found in the claims" (Plaintiff's response to defendants' opening brief at 7) but by inserting additional language in their construction, defendants are attempting to impermissibly narrow the construction and interject language used exclusively in a prior art, the '057 Lombardi patent. The dispute surrounding the construction is the "terminology of forming rows of regular loops, having a closer knit and smaller openings than the netting arrangement." (Markman Tr. at 66. (emphasis added)) Plaintiffs argue that the only limitations contained within the claim are that the stockinette member be (1) knit, (2) closely knit, and (3) have a first-stretch, *i.e.,* greater stretch capacity, than the netting arrangement. (Markman Tr. at 30.) The Court agrees. The unambiguous language of the claim does not require "regular loops" or any particular stitch be used in the stockinette member.

But defendants contend that the term "rows of regular knit" is necessary for the proper construction of the term "stockinette member" based on the prosecution history wherein plaintiffs distinguished their invention over the prior art of Lombardi. Plaintiffs' Office Action Response, dated August 9, 1994, states with reference to Figure 4 that "the top of the long loop of yarn 42 in wale 3, row 25, being separated from the special yarn [the netting arrangement] in row 27 by one row 26 of regular loops (i.e., loops of the regular yarn)." (Defendants' Exh. B 151.) Based on this language, defendants contend that the stockinette member must be made of regular loops of regular yarn in order to differentiate the stockinette member from the netting arrangement.

Defendants are attempting to impermissibly narrow the plain and ordinary meaning of the claim term. Plaintiffs have not explicitly disclaimed the plain meaning of "stockinette member" in the specification or prosecution history. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (requiring "words or expressions of manifest exclusion or restriction" before broad terms in a claim will be read narrowly in light of a narrow specification (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

With respect to the phrase "closer knit and smaller openings than the netting arrangement," defendants note that in order for the stockinette member to have a greater stretch

capacity and to form a shield as set forth in the "whereby" portion of Claim 1, the stockinette must have a closer knit and smaller openings than the netting arrangement. The claim language requires that the stockinette member be "closely knit" – a term that is not ambiguous. Further, there is nothing in the claim language or specifications to suggest that smaller openings are necessary for the stockinette member to function as intended.

The Court construes "stockinette member" as "a closely knit tube."

### 3. Netting Arrangement

Plaintiffs proposed construction of the term "netting arrangement" is "lateral and longitudinal strands that intersect in locking engagement to form a grid-like pattern." Although quite similar, defendants seek construction of the term as "longitudinal and lateral strands that intersect in locking engagement with one another to form a grid-like pattern and *having not as close a knit and larger opening than the stockinette member*." Defendants' construction is the flip side of their construction for "stockinette member." In other words, if the construction of "stockinette member" includes "having a closer knit and smaller opening than the netting arrangement," the netting arrangement must have a less close knit and a larger opening that the stockinette. As discussed above, this is an impermissibly narrow construction.

The term "netting arrangement" has a discernable plain and ordinary meaning. Accordingly, the Court construes "netting arrangement" as "longitudinal and lateral strands that intersect in locking engagement to form a grid-like pattern with less stretch capacity than the threads of the stockinette member."

### 4. Strand

Plaintiffs' proposed construction of "strand" is "a yarn or yarns used in forming the lateral and longitudinal structures of the netting arrangement." Defendants' construction of "strand" is "elasticized or non-elasticized materials including yarn that is heavier than the yarn used to form the stockinette member and having a longitudinal member and a lateral member."

Plaintiff asserts that there is nothing in the claim language or specifications that suggests that the yarn used to form the netting arrangement must be heavier than the thread found in the stockinette member. According to plaintiffs the term "strand" refers to the location of the yarn

only, *i.e.,* "strand" relates solely to the netting arrangement rather than the stockinette member.

By adding defendants' proposed language of "heavier than the yarn used to form the stockinette member," plaintiffs properly contend defendants are limiting the claim to a preferred embodiment while ignoring the second preferred embodiment that actually demonstrates the composition of the yarn used to form the netting arrangement and the stockinette can be the same material, *i.e.*, yarn of the same weight instead of heavier for the netting arrangement and lighter for the stockinette member.

The Court adopts plaintiffs' construction of the term "strand": "a yarn or yarns used in forming the lateral and longitudinal structures of the netting arrangement."

**5.     Thread**

"Thread" was not one of the terms sought to be construed by either party in the opening claim construction brief; however, defendants now contend it must be construed. Plaintiffs responded to defendants' proposed construction in its responsive brief and at the Markman Hearing.

Plaintiffs construe "thread" as "a yarn or yarns used in forming the stockinette member." It is undisputed that throughout the patent, "thread" is associated with the yarn used for forming the stockinette member. Defendants suggest that "thread" be construed as "yarn comprising cotton, polyester, nylon or other suitable materials, that is finer than the yarn used to form the netting arrangement," contending this construction falls within the "ordinary and customary meaning" of the term within the context of the specification, and is supported by plaintiffs' expert.

As noted in the above discussion of the term "strand," plaintiffs contend that the terms "strands" and "threads" are intended to do nothing more than describe the location of the yarns. "Strand" or "strands" refer to the netting arrangement; "thread" or "threads" refer to the stockinette member. Plaintiffs state they acted as their own lexicographers, which is permissible. But when acting as its own lexicographer, the patentee must set forth an explicit definition of the term different from its ordinary and customary meaning. *Phillips*, 415 F.3d at 1316.  Plaintiffs have not done so here.

Under the ordinary and customary meaning to a person of ordinary skill in the art in question at the time of the invention, "thread" would likely be considered a finer gauge yarn than a strand. This is borne out by plaintiffs' expert's testimony that the threads of the stockinette are finer than the strands of the netting arrangement:

> Q. So, I believe you're indicating that a thread and a strand are both yarns, is that correct?
> A. Yes, sir.
> Q. So how are they different?
> A. To me, a thread is finer, a light yarn, a thin yarn.

(Defendants' Exh. F, Mademann Depo. at 66).

Only if plaintiffs made clear they were defining "thread" differently than its ordinary and customary meaning would "thread" not connote a finer gauge yard. Nevertheless, there is no requirement in the claim language or the specifications that require the yarns used to make the netting arrangement be heavier than those used to make the stockinette member which is clear in reference to the second preferred embodiment: "the strands of the netting arrangement are knit into the stockinette of the same threads which form the stockinette."

The Court construes "thread" as "a yarn or yarns used in forming the stockinette member."

### 6. Longitudinal Strand

Plaintiffs seek to have the Court construe the term "longitudinal strand" as "strand or strands which run in the length-wise direction of the netting structure." Defendants propose the term be defined as "strands forming the netting arrangement extending in the longitudinal direction which do not include any stitch loops and are not immediately next to another parallel longitudinal loop."[2]

Plaintiffs base their definition on the plain and ordinary meaning because "the term has no special meaning." (Plaintiffs' Opening Claim Construction at 16.) Defendants contend that

---

[2] Defendants' latest construction of the terms "longitudinal strand" and "lateral strand" differ from that found in the joint claim construction statement, their responsive claim construction brief and their opening claim construction brief. As a result, their arguments concerning the these terms are found in the Markman hearing transcript.

plaintiffs provide no support for their construction, either intrinsic or extrinsic. (Defendants' Responsive Claim Construction at 15.)  But according to plaintiffs, defendants' construction is premised on a preferred embodiment.  A particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment. *Electro Med. Sys. S.A. v. Cooper Life Sci., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

In explaining why the definition of "longitudinal strand" should not include any stitch loops, defendants state that stitch loops are "the little loops in the lateral strands that connect to the regular loops of the stockinette." (Markman Tr. at 73.)  "When the meat product is stuffed into the netting, the heavy yarn will be pulled tight, causing these little loops to disappear so that the heavy yarn with be firmly pressed against the product. So if these lateral strands disappear when the meat goes in there, we don't think they should be construed as a longitudinal strand." *Id.*  Defendants do not "feel that a stitch loop can contribute to a four-sided shape when it disappears – when its longitudinal component disappears when it is stretched." *Id.* at 74. Defendants provide no intrinsic or extrinsic evidence to support their belief and the Court finds none in the claim language, specifications or prosecution history.  As a result, the construction of "longitudinal strand" does not require the inclusion of "which do not include any stitch loops" language.

Defendants also seek to include language that the netting arrangement strands are "not immediately next to another parallel longitudinal loop" based upon the claim language which provides that the netting arrangement is comprised of a "first plurality of *spaced strands*" in the longitudinal direction.  The dispute becomes whether a strand is a single yarn or whether a strand can be composed of several yarns.  Plaintiffs argue that "[a] strand is a very broad concept and doesn't refer to one individual filament or 2 or 3 or 20, or however many you wanted to use. The strand is the structure itself; it's not the components of the structure." (Markman Tr. at 88.) Plaintiffs' interpretation is based on how the term "strand" is used in Claim 1 and how it is used throughout the patent.  The Court agrees.  Although the claim language requires that the longitudinal strands be spaced in order to create the checkerboard pattern, defendants seek to

limit longitudinal strands to a single component, *i.e.*, an individual strand, by including language that strands are "not immediately next to another parallel longitudinal loop."  Defendants point to Figure 12 which "basically shows no spacing between the longitudinal strands and basically cannot create a checkerboard pattern."  (Markman Tr. at 74.)  It appears defendants are using the term "strand" as a component rather than as a structure.  When "longitudinal strands" are considered as a structure, the claim language requiring that those strands be spaced needs no further definition of the kind defendants suggest.  Defendants have not offered any intrinsic or extrinsic evidence to support this construction.

The Court construes "longitudinal strand" as "strand or strands which run in the length-wise direction of the tubular casing."

### 7.   Lateral Strand

The proper construction of "lateral strand" according to plaintiffs is "strand or strands which run perpendicularly to longitudinal strand(s) around the circumference of the tube of the netting structure."  In contrast, defendants construe the term as "strands forming the netting arrangement extending in the lateral direction which does not form rows of regular loops and are not immediately next to another parallel lateral strand."

Like their definition of "longitudinal strand," plaintiffs rely on a plain and ordinary meaning for the term "lateral strand", which defendants assert is unsupported.  (Defendants' Responsive Claim Construction at 15-16.)   But as previously noted, "claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex*, 299 F.3d at 1327.

Defendants point to the prosecution history where plaintiffs distinguished their invention from the Lombardi prior art to support their definition of "lateral strand" as not formed with rows of regular loops. (Markman Tr. at 71-72.)  As defendants explain, because the stockinette member is formed of rows of regular loops, the lateral strand, being a component of the netting

structure, cannot form rows of regular loops. *Id.* "If the lateral strands did form rows of regular loops, we don't see how a checkerboard pattern could result in a meat product." *Id*. at 71-72. The Court disagrees. When "strand" is construed without regard to the weight of the yarn, and the stockinette member is not required to be comprised of rows of regular loops, a lateral strand would function in a manner that would create the netting arrangement's intended pattern and would not become part of the stockinette member shield.

Defendants' proposed inclusion of language that the netting arrangement strands are "not immediately next to another parallel lateral strand" is based upon the claim language which provides that the netting arrangement is comprised of a "second plurality of *spaced strands*" in the lateral direction. But as with defendants' argument concerning their proposed construction of longitudinal strands, *i.e.*, they are "not immediately next to another parallel longitudinal loop," defendants are using the term "strand" as a component rather than as a structure. As set forth in the claim language, the structure of lateral strands is spaced. Defendants have not offered any intrinsic or extrinsic evidence that shows plaintiffs intended to deviate from the plain and ordinary meaning of the term. Accordingly, no additional defining terms are needed.

The Court construes "lateral strand" as "strand or strands which run perpendicularly to longitudinal strand(s) around the circumference of the tubular casing."

**8.      Locking Engagement**

Plaintiffs propose the proper construction of "locking engagement" as "the intersection of the longitudinal and lateral structures to form a netting arrangement." Defendants' proposed construction is: "each longitudinal strand of the netting arrangement is interlaced with an adjacent preceding longitudinal strand of the netting arrangement and an adjacent following longitudinal strand of the netting arrangement wherein the longitudinal strands of the netting arrangement are not separated from one another by a row of regular loops."

"Intersection" or "intersecting" is not a term that is subject to construction here: "Both Plaintiffs and Defendants have agreed that the term 'intersecting' should be defined as having, as two geometrical loci, one or more points in common: intersecting strands." (Defendants' Opening Claim Construction at 21.) As noted above, plaintiffs' proposed construction of

"locking engagement" is the mere intersection of the lateral and longitudinal strands – the strands of the netting arrangement having one or more points in common. This definition does not suggest that the intersection of strands is fixed in making the netting arrangement. Claim 1 speaks of the longitudinal and lateral strands of the netting arrangement "each intersecting in locking engagement"; therefore, "locking engagement" is the "how" the strands are meant to intersect, and not the intersection itself. As plaintiffs assert: "All we say is locking engagement means the intersection of longitudinal and lateral structures to form a netting arrangement. *They have to be locked at the corners in order to be a net by definition*." (Markman Trans. at 43. (emphasis added))  Plaintiffs' proposed construction does not define or even reference that the intersection of the netting arrangement strands is fixed or locked in any manner. Consequently, plaintiffs' construction is rejected.

Nevertheless, "locking engagement" has a plain and ordinary meaning within this patent, *i.e.*, at the intersection of the lateral and longitudinal strands, the strands are fixed so as to prevent the strands from shifting. Relying on a "plain and ordinary meaning" may be inadequate when a term has more than one "ordinary" meaning but in the present case the term is not ambiguous nor have plaintiffs restricted the term in the specifications. *See Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002) (requiring "words or expressions of manifest exclusion or restriction" before broad terms in a claim will be read narrowly in light of a narrow specification").

The term "locking engagement" was defined for the first time in the prosecution history and according to defendants, "[i]n order to more clearly distinguish Applicant's claimed invention over Henricus and Lombardi." (Defendants' Exh. B 148.) Plaintiffs amended what was then claim 15 "to specify that the longitudinal and lateral strands of the netting arrangement <u>each</u> intersect in <u>locking engagement</u> with one another to form a grid-like pattern comprising a plurality of four-sided shapes." *Id.*

Plaintiff further stated in the prosecution history:

> As it is apparent from Figs. 1 and 2 of the present application, the longitudinal strands of 5 and the lateral strands of 7 each intersect with one another to form a grid-like pattern comprising a plurality of four-sided shapes. **Each loop 9 of the**

> **lateral strands 7 is interlaced with an adjacent preceding loop and an adjacent following loop to thereby provide a locking engagement between the longitudinal and lateral strands at their point of intersection**, the longitudinal stands 5 being formed by the interlaced aligned loops 9 . . .

(Defendants' Exh. B 148-149. (emphasis added))

Citing this amendment, defendants contend that their proposed construction of the term "locking engagement" is what plaintiffs explicitly defined in their amendment to claim 15, which became independent Claim 1: an interlacing of an adjacent preceding loop and an adjacent following loop of the longitudinal and lateral strands at their intersection.  But the term "interlacing" is a means of creating a locking engagement but not necessarily the only means of creating a locking engagement and the first and second preferred embodiments do not demonstrate an interlacing of an adjacent preceding loop and an adjacent following loop

Defendants also contend that plaintiffs affirmatively stated what the term "locking engagement" did *not* include – rows of regular loops separating the "locking engagements" of the longitudinal strands.  Defendants point to the prosecution history where plaintiffs distinguished their invention over Lombardi.

> In Lombardi, each loop of special yarn [the netting arrangement] extending in the longitudinal direction does not intersect in locking engagement with each special yarn extending in the lateral direction to form a grid-like pattern.  This is also apparent from Fig. 6 of Lombardi, where the aligned long loops of special yarn are each separated from one another by a row of regular loops [the stockinett member].  Accordingly, there is no teaching or suggestion whatsoever in Lombardi in respect of providing a knitted netting arrangment comprising a first plurality of spaced strands extending in the longitudinal direction and a second plurality of spaced strands extending in the lateral direction, wherein the longitudinal and lateral strands each intersect in locking engagement with one another to form a grid-like pattern, *as in Applicant's claimed invention.*

(Defendants' Exh. at B 151. (underlining in original; italic added))

Once again, defendants are attempting to read a feature of the third preferred embodiment into the claim as a limitation while ignoring the first and second preferred embodiments.

Based on the unambiguous meaning of the term, the Court construes "locking engagement" as "fixed at each intersection."

### 9.  Checkerboard Pattern

The parties are in substantial agreement concerning the phase "checkerboard pattern":

"parallel vertical and horizontal impressions and crossing at right angles which results in a four sided impression."  But defendants contend the phrase *"approximately equidistant"* should be added to the definition.  This argument is based on the plain and ordinary meaning of "checkerboard pattern" and on defendants' expert's testimony that such a shape is square.  Plaintiffs argue that adding "approximately equidistant" improperly narrows the construction in that a checkerboard pattern is not limited to perfect squares.  Because of the second-stretch capacity of the netting arrangement, the indentations may not appear on the meat products as perfect squares but the basic shape of the netting arrangement is an approximate square.  The plain and ordinary meaning of the term "checkerboard pattern" includes "approximately equidistant".

The Court construes "checkerboard pattern" as: "parallel vertical and horizontal impressions approximately equidistant and crossing at right angles which result in a four-sided impression."

**IT IS SO ORDERED.**

DATED:  February 13, 2009

_____
M. James Lorenz
United States District Court Judge

COPY TO:

HON. CATHY ANN BENCIVENGO
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL